# Richmond.

## B. M. Jacobs v. J. L. Carter.

March 20, 1930.

Absent, Hudgins, Gregory and Browning, JJ.

The opinion states the case.

*E. C. Hurt, Jr.*, for the plaintiff in error.

*N. E. Clement*, for the defendant in error.

EPES, J., delivered the opinion of the court.

This is an action brought by notice of motion for judgment by B. M. Jacobs against J. L. Carter to recover $503.50 damages to the stock of jewelry and fixtures of Jacobs caused by water flowing from a burst water pipe which supplied the second floor of a building owned by Carter. The lower floor of the building was leased by Carter to Jacobs and the upper floor to Dr. Bennett. The pipe was burst by water freezing therein. The jury found a verdict in favor of Jacobs for $350.00, which the court, on the motion of the defendant, set aside as contrary to law and evidence, and entered judgment for the defendant. Jacobs assigns error.

Carter owned a building on Main street in the town of Chatham which adjoined the building occupied by Carter himself. The lower floor of this building was a store which was leased by Carter to Jacobs, who conducted therein a jewelry store. The upper floor of this building consisted of a front office which was occupied by Mrs. Powell, and a suite of offices in the rear, consisting of two large rooms and a toilet, which were leased by Carter to Dr. Bennett, a practicing physician, who used them for his offices. Dr. Bennett had the exclusive use and occupancy of the offices and toilet leased to him. The building had been originally constructed for the occupancy of Dr. Bennett by Mr. Hargrave. Dr. Bennett was renting these offices when Carter purchased the property several years prior to January, 1928, and had been renting them from Carter ever since his purchase of the property.

There seems to have been no provision for a water supply in the office occupied by Mrs. Powell or in any part of the upper floor other than the offices and

toilet leased to Dr. Bennett. The store room leased to Jacobs and the offices leased to Dr. Bennett were supplied with water, but from entirely separate pipe lines. The pipe line which supplied water to the toilet and offices leased by Dr. Bennett entered the building on the first floor and ran up through the wall and ceiling of the store room occupied by Jacobs. The cut-off for the line supplying water to Jacobs' store room and the cut-off for the line supplying water to Dr. Bennett's offices were both located on the outside of and just in rear of the leased building. Carter had a key which fitted the cut-offs on both the line serving the building he himself occupied and the line supplying the offices of Dr. Bennett; but had not furnished Dr. Bennett a key to cut off the water on the line to his offices, nor had Dr. Bennett ever had such a key. Sometime prior to the freeze in January, 1928, Carter had told Dr. Bennett that he would have a key made for him with which to cut off the water, but Dr. Bennett had told Carter that he had no use for a key because the cut-off was inaccessible.

Dr. Bennett testifies that in order for him to have reached this cut-off it would have been necessary for him to go through the office of J. L. Carter in the adjoining building, or through the store on the floor below his offices which was leased and occupied by Jacobs, or to go through a window in his office, in which was nailed a screen, and thence down a fire escape on an adjoining building which could be reached from his office window. This is nowhere denied in the record. However, both Carter and Dr. Bennett testify that Dr. Bennett carried the ashes from the stove in his office to the back yard where this cut-off was located; but the record does not disclose in what way Dr. Bennett gained access to the back yard for this purpose.

Dr. Bennett had never cut off the water himself; nor had Carter ever cut off the water except at the suggestion or request of Dr. Bennett. But a number of times during the several years he had been renting from Carter, Dr. Bennett had suggested to Carter that the weather was cold and that it might be well to cut off the water, and whenever such suggestion was made to Carter he cut off the water while Dr. Bennett opened the spigots in his office so that the pipes would drain.

The lease to Dr. Bennett contained no reservation to the landlord of any rights in or control over the offices and toilet leased to Dr. Bennett, nor any provision as to whose duty it should be to cut off the water when cold weather made it necessary to do so to prevent the water in the pipes from freezing and bursting the pipes. Nor, so far as the evidence discloses, was there in this lease, or otherwise, any grant to Dr. Bennett of any right of access to the cut-off or any provision made by Carter for him to have access thereto.

On January 30, 1928, there was a sudden drop in the temperature; and that afternoon Carter, recognizing that there was danger that the water in the pipes supplying the offices and toilet of Dr. Bennett would freeze and burst the pipes, inquired of Dr. Bennett's wife as to his whereabouts, and was told that he had been out of town for several days and would not return until about ten o'clock that night. Carter then took his own cut-off key and tried to cut off the water from Dr. Bennett's office line, but found that the water had already frozen both at the cut-off and in Dr. Bennett's office; and that he could not turn the cut-off. Dr. Bennett called Carter on the telephone that night about eight o'clock and Carter advised him of these

facts, but neither of them seems to have advised Jacobs of this condition or to have taken any steps to prevent injury to him.

The freezing of the water in the pipes burst the main line pipe leading up through the wall or ceiling of the store room below at a place at which there was a lead section in the pipe line, with the result that water flowed from this pipe into the store below and damaged Jacobs' stock of goods and fixtures.

The defendant in error lays much stress upon the fact that the lead section which burst was in a pressure line and that standard construction does not permit of the use of lead pipe in a pressure line. But there is no evidence to show that the bursting of the pipe was due to its being a lead pipe, or that an iron pipe would have withstood the pressure due to the expansion of the water in freezing better than a lead pipe, or that the pipe would not have burst had it been an iron pipe. Carter had the pipe repaired at his own cost, and has never made any demand upon Dr. Bennett to pay the cost of the repairs; and after the bursting of this pipe Carter told Dr. Bennett that he would have two keys made, one for him (Bennett) and one for Jacobs, and they would have to be responsible for cutting off the water in cold weather. But Dr. Bennett refused to assume the responsibility of cutting off the water under any circumstances unless Carter put in a cut-off that could be operated from the window of the toilet in Dr. Bennett's office. Soon after this Carter put in a cut-off that could be operated from the window in the toilet in Dr. Bennett's office.

The court gave, among other instructions, the following two instructions at the request of Carter, to both of which Jacobs objected:

Instruction No. 2: "The court further instructs the

jury that if they believe from a preponderance of the evidence that the defendant, J. L. Carter, is the owner and lessor of the building and lot, and has leased the same to tenants, without reservation, and such was true at the time of the damage to plaintiff caused by the bursting of a water pipe in the building, he had no control over the building and water pipes and is not liable."

Instruction No. 3: "The court instructs the jury that the only duty devolving upon the defendant in connection with the water pipes was to repair them or put them in order when notified they were out of order."

The plaintiff in error assigns as error the giving of the instructions above quoted, and the action of the court in setting aside the verdict of the jury and in entering up final judgment for the defendant.

The court erred both in giving the instructions above quoted, and in setting aside the verdict of the jury and entering judgment for the defendant. These instructions and the action of the court in setting aside the verdict of the jury are predicated upon the conclusion of the court that the evidence shows as a matter of law that it was the exclusive duty of Dr. Bennett to have cut off the water, and that under the facts in this case no duty rested upon Carter, the owner and lessor of the premises, to do so. We think that this conclusion, as a matter of law, is not warranted by the facts in this case.

██ Where the upper and lower floors of a building are supplied with water by separate water systems and a landlord leases the lower floor of the building to one tenant, expressly or impliedly retaining control of the water pipes supplying the upper floor, he owes, in absence of any provision to the contrary in the

lease of the lower floor, a duty to the tenant of the lower floor to use ordinary care and prudence to prevent damage to the tenant of the lower floor by reason of water freezing in and bursting the pipes supplying the upper floor. *Kecoughtan Lodge* v. *Steiner & Kaufman*, 106 Va. 589, 56 S. E. 569, 10 Ann. Cas. 256; *Adams, etc., Co.* v. *C. & O. Ry. Co.*, 118 Va. 500, 88 S. E. 171; *Evans* v. *Kirson*, 88 W. Va. 343, 106 S. E. 647; *Dreeves* v. *Schoenberg*, 82 N. J. Law, 335, 82 Atl. 530. But where the landlord has leased the entire upper floor (or that part thereof served by the water system) to another tenant without any reservation of rights therein or control thereof; and has provided reasonably adequate and proper means whereby the tenant of the upper floor may cut off the water, has placed the tenant of the upper floor in control of such means, and has relinquished all control thereof to the upper tenant, in the absence of any other circumstances imposing a duty on the landlord to cut off the water, the landlord owes no duty to the tenant of the lower floor to cut off the water in order to prevent the water freezing in and bursting the pipes. *Dudley* v. *Lewis Shoe Co.*, 113 Va. 41, 73 S. E. 434.

Where, however, though the lease of the upper floor is silent as to whose duty it is to cut off the water from the upper floor when cold weather makes it necessary to do so in order to prevent the water in the pipes from freezing and bursting the pipes, the landlord has not provided reasonably adequate and proper means whereby the tenant of the upper floor may cut off the water, or having provided such means has not placed him in control thereof and relinquished all control thereof to him, the landlord owes the duty to his tenant of the lower floor to use ordinary care and prudence to cut off the water from the upper floor where

changes in temperature make it necessary to do so in order to prevent the water freezing in and bursting the pipes; and he is liable to the tenant of the lower floor for any injury that he may suffer by reason of his negligent failure to perform such duty. See in this connection *Martindale Clothing Co.* v. *Spokane & Eastern Trust Co.*, 79 Wash. 643, 140 Pac. 909.

From the evidence in this case a jury might fairly draw the inference that Carter had neither provided the tenant of the upper floor with adequate and proper means for cutting off the water, nor relinquished control of such means as existed to the tenant of the upper floor, but had retained control thereof himself; and it was error for the court to have, in effect, instructed the jury in the above quoted instructions that as a matter of law Carter owed no duty to Jacobs to cut off the water from the upper floor. For the same reason the court erred in setting aside the verdict of the jury as contrary to the law and evidence.

The judgment of the court will be reversed; and judgment will be here entered for the plaintiff on the verdict of the jury.

*Reversed.*